**LTV STEEL CO., INC., AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation and WCI Steel, Incorporated, Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**AG Der Dillinger Huttenwerke, et al., Defendant–Intervenors.**

Slip No. 97–104.
Court No. 93–09–00568–CVD.

United States Court of
International Trade.

July 25, 1997.

---

**2.** This fact presumably tended to support Charles's claim that others were responsible for the attack on Gordon.

Dewey Ballantine, Washington, DC (Michael H. Stein, Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, O. Julia Weller, Kristen M. Neller: on brief), (John A. Ragosta, Guy C. Smith: on oral argument); Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer, D. Scott Nance: on brief), counsel for LTV Steel Company, Incorporated, et al.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (A. David Lafer, Jeffrey M. Telep); Jeffrey C. Lowe, Attorney–Advisor, Office of Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC, counsel for defendant.

Sharretts, Paley, Carter & Blauvelt, P.C., Washington, DC (Gail T. Cumins, Ned H. Marshak, Beatrice A. Brickell), counsel for Thyssen Stahl AG, et al.; LeBoef, Lamb, Greene & MacRae, L.L.P., Washington, DC (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel), counsel for AG der Dillinger Hüttenwerke; Hogan & Hartson, Washington, DC (Lewis E. Leibowitz, Steven J. Routh), counsel for Fried. Krupp AG Hoesch–Krupp, et al.

## OPINION

CARMAN, Chief Judge.

In accordance with a February 18, 1994 scheduling order, and after extensive consultation with the parties and upon their consent, the parties were directed to brief five general issues regarding determinations by the Department of Commerce, International Trade Administration ("ITA") addressing steel products from various countries.[1] The order also set forth a schedule for the parties to submit briefs on country–specific issues raised by the ITA's determinations. In prior opinions, this Court has disposed of all challenges to the five general issues and they are presently on appeal before the United States Court of Appeals for the Federal Circuit. *See British Steel, PLC v. United States*, 936 F.Supp. 1053 (CIT 1996) (*"British Steel IV"*); *British Steel plc v. United States*, 929 F.Supp. 426 (CIT 1996) (*"British Steel III"*); *British Steel plc v. United States*, 924 F.Supp. 139 (CIT 1996) (*"British Steel II"*), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996); *British Steel plc v. Unit-*

---

1. The five general issues were: (1) Commerce's use of a 15–year allocation period to determine the benefit from each of the nonrecurring countervailable grants; (2) Commerce's use of a grant methodology to countervail equity infusions into an uncreditworthy company whose shares are not publicly traded; (3) Commerce's treatment of privatization and restructuring regarding previously received subsidies, including Commerce's use of a repayment methodology; (4) Commerce's determination of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries; and (5) Commerce's treatment of disproportionality for the purposes of evaluating the specificity of a potentially countervailable program.

ed States, 879 F.Supp. 1254 (CIT 1995) ("British Steel I"), appeals docketed, Nos. 96–1401 to –06 (Fed. Cir. June 21, 1996) (collectively the "British Steel cases" or the "general issues opinions"). What remains before this Court, therefore, are the parties' country–specific challenges to Commerce's steel determinations. This opinion will not address the challenges raised in the parties' papers regarding the propriety of Commerce's privatization methodology as this issue has been decided conclusively in the general issues opinions.[2] See British Steel IV, 936 F.Supp. at 1065–71; British Steel I, 879 F.Supp. at 1285–88. This opinion will address only the German country–specific issues which remain undecided following this Court's issuance of the British Steel opinions. While the Court believes this opinion is in no way inconsistent with its prior opinions addressing the general issues, to the extent this opinion is seen to conflict in any way with the Court's general issues decisions, this Court's findings in the general issues opinions will prevail.

Four Motions for Judgment on the Agency Record were filed in this case challenging the Department of Commerce's ("Department" or "Commerce") Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Germany, 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determ.) ("German Certain Steel Final Determination"). The first motion was filed by AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation and WCI Steel, Incorporated (collectively "Domestic Producers" or "Domestics"). In British Steel IV, this Court completed its findings with respect to all issues related to privatization raised in the general issues opinions, and thus disposed of the privatization issues involved in

this case. See British Steel IV, 936 F.Supp. at 1057. In so doing, this Court also addressed one of the four issues contained in the motion filed by Domestic Producers, and entered partial final judgment under U.S. CIT R. 54(b) as to the corresponding counts in the Domestic Producers' complaint.[3] See id. at 1071–72. In this opinion, the Court will address the remaining three issues in the Domestic Producers' Motion for Judgment on the Agency Record.

The second Motion for Judgment on the Agency Record was filed by AG der Dillinger Hüttenwerke ("Dillinger"). In British Steel IV, this Court addressed in its entirety Dillinger's Motion for Judgment on the Agency Record and entered final judgment as to the complaint filed by Dillinger. See id at 1072. As a result, the Court will not address Dillinger's Motion for Judgment on the Agency Record in this opinion.

The third and fourth Motions for Judgment on the Agency Record were filed by Fried. Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG (collectively "Fried. Krupp") and Thyssen Stahl AG, Thyssen Steel Detroit Company and Thyssen, Incorporated (collectively "Thyssen"). This Court will address Fried. Krupp's and Thyssen's Motions for Judgment on the Agency Record in their entirety in this opinion, because both of the motions concern country–specific issues which have not been addressed previously by this Court. The Court heard oral argument on the non–privatization issues in this case, and has jurisdiction over this matter under 28 U.S.C. § 1581(c) (1988).

## STANDARD OF REVIEW

 In reviewing a final determination by Commerce, this Court must sustain the determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is that which " 'a reasonable mind might accept as adequate to support a con-

---

2. See also Saarstahl AG v. United States, 967 F.Supp. 1311, 1314–17 (CIT 1997) for a discussion of the privatization general issue.

3. Specifically this Court entered final judgment pursuant to U.S. CIT R. 54(b) as to Counts I, II and III in the Domestic Producers' complaint filed in LTV Steel Co., Inc., et al. v. United States, Court No. 93–09–00568–CVD.

clusion.'" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (citation omitted), *quoted in Matsushita Elec. Indus. Co., Ltd. v. United States,* 3 Fed Cir. (T) 44, 51, 750 F.2d 927, 933 (1984).

■ The Court must accord substantial weight to the agency's interpretation of a statute it administers. *See American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). The Court is not to substitute its own determination for the agency's but rather is to determine whether Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (noting "the possibility of drawing two inconsistent conclusions from the evidence does not permit an administrative agency's finding from being supported by substantial evidence"); *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68 (1951) (reviewing court may not "even as to matters not requiring expertise ... displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo* ").

## BACKGROUND

The countervailing duty determinations at issue in this case involve various grants provided by both the Government of Germany ("GOG") and various regional governments to six steel producers: AG der Dillinger Hüttenwerke ("Dillinger"), Hoesch SG ("Hoesch"), Klöckner Stahl AG ("Klöckner"), Preussag Stahl AG ("Preussag"), Thyssen AG ("Thyssen"), and Walzwerk Ilsenburg ("Ilsenburg") to ease the difficulties brought about by the decline in demand and reduced prices for steel and to reduce the financial hardships associated with plant closings and German reunification in the mid–1970s and 1980s. Commerce determined a variety of different "countervailable subsidies [we]re being provided to manufacturers, producers, or exporters in Germany of certain steel products" under a variety of programs.[4] *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,316. The countervailable subsidies included (1) capital investment grants; (2) structural improvement aids; (3) grants to companies investing in certain regions in Germany; (4) assistance to companies in depressed areas; (5) special subsidies for companies located in the zonal border area; (6) nonrecurring grants relating to environmental protection for steel companies investing in the Ruhr region; (7) grants for expenses incurred with respect to displaced employees; and (8) a variety of other grants, assistance, loans and benefits.

Central to Commerce's investigation in this case are its determinations regarding the events in Germany involving Saarstahl Volkingen GmbH ("Saarstahl SVK").[5] Prior

---

**4.** The statute provides a countervailable domestic subsidy is a benefit "provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise." 19 U.S.C. § 1677(5)(A)(ii) (1988).

**5.** As is also explained below, the events involving Saarstahl SVK are relevant to this case because

Saarstahl AG and AG der Dillinger Hüttenwerke, a party in this case, are both subsidiaries of Dillinger Hütte Saarstahl AG. Commerce also relied upon its findings regarding Saarstahl AG in *Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed. Reg. 6,233 (Dep't Comm.1993) (final determ.) to support some of its determinations regarding Dillinger in the investigations at issue in this case.

to April 1, 1989, two steel companies existed in the Saarland region of Germany: Saarstahl SVK, a producer of long products and AG der Dillinger Hüttenwerke ("Dillinger"), a producer of cut–to–length carbon steel plate. Until 1986, Saarstahl SVK was wholly owned by Arbed Luxembourg ("Arbed"), a Luxembourg state–owned company. Dillinger was owned by Usinor Sacilor, which is owned by the French government.

By 1985, Arbed was no longer able or willing to function as the owner of Saarstahl SVK. Because of the importance of Saarstahl SVK to the regional economy, the Government of the Saarland ("GOS") decided to search for a new owner to replace Arbed. In a complicated transaction culminating on June 30, 1989, Saarstahl SVK was first transformed into a new company known as DHS–Dillinger Hütte Saarstahl AG ("DHS"), and the long–products–producing assets of Saarstahl SVK were then spun off into a newly created subsidiary of DHS known as Saarstahl AG. Simultaneously with the creation of Saarstahl AG, DHS acquired Dillinger as a wholly–owned subsidiary. As a result of these events, DHS became a holding company with two operating subsidiaries, Saarstahl AG and Dillinger, and was owned 70 percent by Usinor Sacilor, 27.5 percent by the GOS and 2.5 percent by Arbed.[6]

As a precondition for this transaction's completion, the GOG and the GOS entered into an agreement concerning the previous assistance received by Saarstahl SVK from the GOG and GOS in accordance with a Restructuring Plan they adopted in 1978 to restore competitiveness to Saarstahl SVK and to create a viable steel industry in the Saarland. Under this agreement, all outstanding repayment obligations for the funds provided to Saarstahl SVK, as well as the additional rights held by both governments for the repayment of the principal on the guaranteed loans, were forgiven and relinquished. At the request of the governments,

private banks also forgave a portion of the debt owed to them by Saarstahl SVK.[7]

Commerce published notice of the initiation of a countervailing duty investigation of Saarstahl AG on May 8, 1992, based on a petition filed by Inland Steel Bar Company and Bethlehem Steel Corporation against imports of certain hot–rolled lead and bismuth carbon steel products from Germany. Commerce issued its *Preliminary Determination* on September 10, 1992, and found that the debt forgiveness by the GOG and the GOS as well as the debt forgiveness by the private banks constituted countervailable benefits which were provided directly to DHS. *See Preliminary Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 57 Fed.Reg. 42,971 (Dep't Comm.1992) (prelim. determ.). On January 19, 1993, in its *Final Determination,* Commerce determined because the German governments' forgiveness of Saarstahl SVK's debts was necessary to effect the sale or privatization of Saarstahl SVK, the entire amount of debt–forgiveness directly benefitted Saarstahl SVK's new parent, the then newly–formed DHS, and therefore was a countervailable subsidy to DHS. *See Final Affirmative Countervailing Duty Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 6,233 (Dep't Comm.1993) (final determ.)

## DISCUSSION

### A. Domestic Producers' Motion for Judgment on the Agency Record

Domestic Producers challenge portions of Commerce's *German Certain Steel Final Determination,* arguing it is not supported by substantial evidence on the record and is not otherwise in accordance with law. Domestic Producers raise three country–specific chal-

---

See Def.'s Mem. in Resp. to Pls' Mots. for J. Upon Agency R. ("Def.'s Br.") at 4.

**6.** DHS owned 100 percent of Saarstahl AG and 95 percent of Dillinger. Both Saastahl AG and Dillinger had profit and loss agreements with DHS under which they were to transfer any profits to DHS and DHS was required to assume

any losses incurred by Dillinger and Saarstahl AG.

**7.** For a more extensive background of Saarstahl SVK, *see Saarstahl AG v. United States,* 967 F.Supp. 1311, 1313–14 (CIT 1997).

lenges to Commerce's *German Certain Steel Final Determination.*

### 1. *Commerce's Application of the 0.5 Percent Rule*

Commerce's policy with respect to countervailable grants is to expense recurring grants in the year of receipt and to allocate nonrecurring grants over the useful life of assets in the industry being investigated. *See General Issues Appendix to Final Affirmative Countervailing Duty Determination: Certain Steel Products From Austria,* 58 Fed.Reg. 37,225, 37,226 (Dep't Comm.1993) (*"General Issues Appendix"*).[8] In several instances, steel companies that are parties in this case received numerous small non–recurring grants under various subsidy programs in a particular year. In those instances, Commerce elected to expense[9] in the year of receipt, rather than amortize, any nonrecurring grants which constituted less than 0.5 percent of the recipient's net sales in the year in which the grant or grants were received. This exception to Commerce's normal allocation policy is known as the 0.5 percent test. *See General Issues Appendix,* 58 Fed.Reg. at 37,226–27 (detailing Commerce's policy with respect to the 0.5 percent test); *Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments,* 54 Fed.Reg. 23,366, 23,384 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.49(a)(3)(i)(A)) (*"Proposed Regulations"*) (proposing application of 0.5 percent test to grants or equity infusions received under a particular program during a year where the total amount of all grants or infusions is less than 0.5 percent of total sales).[10]

Commerce's *Proposed Regulations* explain its policy with respect to grants, and is intended "to avoid any anomalies caused by the interaction of the Department's allocation formula and the *de minimis* rule contained in § 355.7 of the Commerce Regulations." *Proposed Regulations,* 54 Fed.Reg. at 23,376 (citation omitted).[11]

In exercising this exception to its normal allocation policy, Commerce rejected an alternative approach advocated by Domestic Producers to aggregate the benefits provided by the various grant programs before determining whether the total amount of grants received exceeds 0.5 percent of total sales. Commerce determined that its program–specific approach to the 0.5 percent test was consistent with its overall countervailing duty methodology and did not result in disparate or otherwise unfair treatment. Commerce explained

> We have decided to continue to apply th[e 0.5 percent] test on a program–by program basis rather than applying the test against the aggregate amount of benefits received under all programs. We determine that this is consistent with our general practice of analyzing the nature of a benefit within the limits of a particular program rather than in the context of every program under investigation.

*General Issues Appendix,* 58 Fed.Reg. 37,226. Addressing objections that Commerce's policy could allow foreign governments to circumvent the law by providing multiple small subsidies rather than a single large subsidy, Commerce explained "[e]ach determination of countervailability and each bene-

---

**8.** The Department's policy regarding this issue was laid out in the *General Issues Appendix,* and was applicable to this and all of the other final determinations in the steel cases.

**9.** When Commerce "expenses" a nonrecurring grant, the agency will allocate the entire amount of the benefit to the year in which it is deemed to be received, rather than allocating it over the useful life of the assets. *See Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments,* 54 Fed.Reg. 23,366, 23,375 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.49(a)(2)) (*"Proposed Regulations"*).

**10.** In 1989, Commerce published *Proposed Regulations* addressing both the valuation of subsidies

and the identification and measurement of foreign government programs most frequently encountered by the Department.

**11.** Under the *de minimis* rule, Commerce will "disregard any aggregate net subsidy that [it] determines is less than 0.5% *ad valorem* [ (*i.e., de minimis* ) ], or the equivalent specific rate." 19 C.F.R. § 355.7 (1994). The purpose of applying the *de minimis* rule is to determine whether the total benefit subject to countervailability in a given year, whether expensed in that year or amortized from a prior year, is of sufficient magnitude to warrant imposition of a countervailing duty. This rule is distinct from the 0.5 percent test at issue in this case.

fit calculation by the Department, is made on a program–specific basis", therefore, "it is appropriate to apply the 0.50 percent test on the same basis." *Id.* at 37,228.

Domestic Producers assert they "do not take issue with the Department's determination not to allocate over time nonrecurring programs falling below a certain threshold level." (Domestic Producers' Mem. in Supp. of Mot. for J. Upon Agency R. ("Domestics' Br.") at 25.) Domestic Producers argue, however, Commerce's failure to apply the 0.5 percent test to the sum of grants received under all programs in a given year is not supported by substantial evidence on the record, is fundamentally flawed and is contrary to law. Domestic Producers maintain "[i]n previous determinations, the Department ha[s] instead expensed only those grants which, *together with all other grants received in the same year,* constituted less than 0.5 percent of the recipient's net sales in the year of receipt." (*Id.* at 8 (footnote omitted).) Domestics assert, therefore, Commerce erred when it "failed to explain its decision to apply the 0.5 percent allocation test to grants received under individual programs, rather than—as in previous cases—to all grants received under all programs." (*Id.* at 11–12.) Domestics add "[m]oreover, even if the Department had explained this change, its new policy leads to absurd results and is inconsistent with the statute that the Department is entrusted with enforcing." (*Id.* at 12.)

Domestics point to the different methodology followed by Commerce in a 1984 countervailing duty case, where Commerce determined to " 'total *all* grants. If the sum is less the [sic] .5 percent of all sales ... we will allocate such grants only to the year of receipt.' " (Domestics' Br. at 28–29 (quoting *Cold–Rolled Carbon Steel Flat–Rolled Products from Argentina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,018 (Dep't Comm.1984) (final determ.) (emphasis added by Domestic Producers)).) Domestic Producers point to another case where Commerce combined

subsidies received by Korean firms under two different programs before applying 0.5 percent test, stating it would " 'compare the sum of *all* grants received *in any given year* with 0.5 percent of total sales.' " (Domestics' Br. at 29 (quoting *Final Affirmative Countervailing Duty Determination; Cold–Rolled Carbon Steel Flat–Rolled Products From Korea; and Final Negative Countervailing Duty Determination; Carbon Steel Structural Shapes From Korea;* 49 Fed.Reg. 47,284, 47,288 (Dep't Comm. 1984) (final determ.) (emphasis added by Domestic Producers)).) Domestics additionally cite other cases in which Commerce aggregated grants received under two different programs before applying the 0.5 percent test and expensed each of the grants because their sum did not exceed 0.5 percent of sales in the year of receipt. (*See* Domestics' Br. at 30 (citing *Stainless Steel Plate From the United Kingdom; Preliminary Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 34,112, 34,114 (Dep't Comm.1986)).) Domestics conclude "[i]t is the perpetuation of this departure from past practice without adequate explanation that constitutes the agency's error." (Domestics' Br. at 34.)

Domestics additionally argue Commerce's rationale for changing its policy and for "applying the 0.5 percent test on a program–by–program basis in this proceeding does not bear close scrutiny" because Commerce "cannot hide the fact that it has, at bottom, no reason for applying the 0.5 percent test to individual programs." (*Id.* at 34, 35.) Domestics assert there are "numerous reasons for applying the test to the aggregate amount of benefits received under all programs." (*Id.* at 36.) Domestics argue if Commerce had applied the 0.5 percent test as they urged, there would have been "a difference in the overall subsidy rates applicable to two of the respondents." (*Id.*)[12]

Finally, Domestic Producers contend "[t]he incentives [for foreign governments] to alter the form of the subsidies provided by the application of this methodology on a program–by–program basis are undeniable."

---

12. Defendant asserts Domestic Producers, however, "cannot point to how the margin of any

particular respondent was affected." (Def.'s Br. at 101 n. 60.)

(*Id.* at 37.) Domestics explain "[t]he Department's application of the rule on a program-by-program basis also yields the absurd result whereby a heavily subsidized company can effectively avoid countervailing duties simply by receiving numerous small grants, none of which individually exceed 0.50 percent of its total sales." (*Id.* at 43.) Domestics add "[a] foreign government would be able to minimize the countervailability of a grant by dividing it into many small grants under different program labels, thereby adopting a 'watering can' approach to subsidies." (*Id.*)

Defendant responds by arguing Commerce's application of the 0.5 percent test is "reasonable and based upon substantial evidence in the record as applied to the facts of these cases." (Def.'s Mem. In Resp. to Pls.' Mots. for J. Upon the Admin. R. ("Def.'s Br.") at 93.) Defendant asserts while Domestic Producers' proposal is not unreasonable, "in order to be consistent with its overall CVD methodology and because no party has demonstrated that Commerce's approach results in disparate or otherwise unfair treatment, Commerce has chosen to apply the test on a program–specific basis." (*Id.*) Defendant contends Commerce adequately explained its reason for adopting the program-specific approach in its countervailing duty determinations, the *Proposed Regulations* and the *General Issues Appendix.*

Defendant contends while its earlier practice of applying the test on the basis of aggregating the grants received under all programs in a particular year was "not necessarily an unreasonable approach", "even as early as 1984, Commerce periodically began applying the 0.50 percent test on a program-by-program basis, and has done so consistently since 1989 when it formally adopted that approach in its proposed regulations." (*Id.* at 94 (citing *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Lamb Meat from New Zealand,* 50 Fed.Reg. 37,708, 37,710 (Dep't Comm.1985); *Galvanized Carbon Steel Sheets From Australia: Final Negative Countervailing Duty Determination,* 49 Fed. Reg. 29,998, 29,999 (Dep't Comm.1984)).) Defendant emphasizes since the *Proposed*

*Regulations* were adopted, "Commerce has applied the 0.50 percent test on a program-specific basis in *every determination it has reached,* including all the investigations involving certain steel products." (Def.'s Br. at 94–95 (footnote omitted) (citing *Preliminary Affirmative Countervailing Duty Determination: Certain Carbon Steel Butt–Weld Pipe Fittings From Israel,* 59 Fed.Reg. 28,340, 28,341 (Dep't Comm.1994); *Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon From Norway,* 56 Fed.Reg. 7,678 (Dep't Comm.1991)).)

Defendant observes Commerce expressly rejected the aggregate approach and explained its reasons for adopting the program-specific approach in the *General Issues Appendix.* The Department explained

In our investigations, we analyze benefits on a program-by-program basis. Each determination of countervailability and each benefit calculation by the Department, is made on a program-specific basis. Therefore, we have determined that it is appropriate to apply the 0.50 percent test on the same basis. In addition, we disagree with petitioners that the current 0.50 percent test has resulted in anomalies in the administration of the CVD law. Despite the extended period of time during which we have applied the 0.50 percent test on a program basis, petitioners have been unable to cite even one instance in which firms were treated differently, or in which foreign governments attempted to circumvent the CVD law through use of the Department's 0.50 percent test. In summary, nothing petitioners have argued leads us to conclude that we should alter the current 0.50 percent test.

*General Issues Appendix,* 58 Fed.Reg. at 37,228. Defendant argues "[i]n effect, whether the subsidy in question is a grant, loan, equity infusion, rebate, or whatever, Commerce *always* determines countervailability and calculates the benefit on a program-specific basis." (Def.'s Br. at 99.)

Defendant also asserts Commerce's application of the 0.5 percent test "in a manner which is consistent with Commerce's overall approach to CVD law also prevents Com-

merce from having to allocate very small benefits over the useful lifetime of assets." (*Id.* at 100.) Defendant argues its policy is consistent with the original purpose behind the 0.5 percent test—to insure the allocation/expense rule would be consistent with Commerce's *de minimis* threshold. Defendant concludes "besides being completely unsupported in the record, [Domestic Producers'] claim that foreign governments may take advantage of Commerce's approach to the 0.50 percent test by circumventing the countervailing duty law does not make political or economic sense." (*Id.* at 102.) [13]

Finally, Thyssen argues Commerce's "application ... of its well–settled practice of not allocating nonrecurring grants over the useful life of assets where the sum of the grants provided under a particular program in a given year is less than 0.50 percent of a firm's total sales in that year was both reasonable and fully in accordance with the CVD law." (Thyssen's Br. in Opp'n to Domestics' Mot. for J. On Agency R ("Thyssen's Opp'n Br.") at 1.) Thyssen therefore asks this Court to sustain the Department's application of the 0.5 percent rule on a program–specific basis.

■ This Court finds Commerce's determination to expense in the year of receipt the benefits associated with any nonrecurring grant which constitutes less than 0.5 percent of the recipient's net sales in the year the grant or grants are received is supported by

substantial evidence on the record and is otherwise in accordance with law. This Court recognizes Domestic Producers' argument that in several previous determinations the Department expensed only those grants which, together with all other grants received in the same year, constituted less than 0.5 percent of the recipient's net sales in the year of receipt. However, this Court also notes that even in several cases decided contemporaneously with the cases cited by Domestic Producers, Commerce applied the 0.5 percent test on a program–by–program basis. Moreover, Commerce has applied the 0.5 percent test on a program–specific basis since Commerce formally adopted a program–specific approach in the *Proposed Regulations* in 1989. *See Final Affirmative Countervailing Duty Determination; Oil Country Tubular Goods from Canada,* 51 Fed.Reg. 15,037 (Dep't Comm.1986); *Final Affirmative Countervailing Duty Determination; Lamb Meat from New* Zealand, 50 Fed.Reg. 37,308 (Dep't Comm.1985); *Final Negative Countervailing Duty Determination; Galvanized Carbon Steel Sheets from Australia,* 49 Fed.Reg. 29,998 (Dep't Comm. 1984). This Court notes Domestic Producers' argument the program–specific approach will lead to circumvention of the countervailing duty laws, but finds Domestic Producers have not demonstrated examples of such practice. This Court further notes the Department has a variety of available options to

**13.** Domestic Producers argue Commerce's policy is inconsistent with the *de minimis* threshold, which is also 0.5 percent. *See supra,* note 11. Domestic Producers assert Commerce's policy could result in a more heavily subsidized company (receiving 10 grants of 0.45 percent of its total sales) escaping countervailing duties because of amortization, while a less subsidized company (receiving one grant of 4.5 percent ·of its total sales) is countervailed. Domestic Producers assert this would result if amortization of the subsidy benefit caused the total benefits during the review year to fall below 0.5 percent of a producer's total sales in the review year, in which case Commerce would consider the review year benefit to be *de minimis* and not countervailable. (Domestics' Br. at 38–39.)

Defendant, however, responds that

[i]t is as least as possible that [Domestic Producers'] proposed approach could result in a relatively heavily subsidized company not being countervailed at all. For instance,

assume that during the period of investigation ("POI") a steel company received three non-recurring, countervailable grants under three separate subsidy programs, each of which totaled 0.30 percent of its sales. Applying [Domestic Producers'] proposal, these three grants would be aggregated, bringing the total to over 0.50 percent of the company's sales and thus requiring that they be allocated over fifteen years. If these were the only grants received by the company, the result would be a *de minimis* margin and no CVD order would be issued. On the other hand, applying Commerce's program-specific policy, because these three grants were received during the POI, each would be expensed. The total would exceed 0.50 percent of total sales, thus surpassing the *de minimis* threshold and insuring that an order would be issued.

(Def.'s Br. at 102 (citations omitted).)

deal with circumvention, should the need occur.

This Court additionally recognizes the methodology set forth in the *Proposed Regulations*, which applies the 0.5 percent test to "grants or equity infusions received *under a particular program* during a year." *Proposed Regulations*, 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.49(a)(3)(i)) (emphasis added). Commerce further emphasized its practice in the *General Issues Appendix* when it explained its policy of amortizing nonrecurring grants "unless the sum of grants provided *under a particular program*" is less than 0.50 percent of a firm's total sales. *General Issues Appendix*, 58 Fed.Reg. at 37,226 (emphasis added). This Court observes both the *Proposed Regulations* and the *General Issues Appendix* address grants received *under a particular program*, and finds the language of both the *Proposed Regulations* and the *General Issues Appendix* supports Commerce's determination.

This Court also notes Commerce explained its rationale for applying the program–specific approach and said, for example, that applying the 0.5 percent test on a program–by–program basis "is consistent with [Commerce's] general practice of analyzing the nature of a benefit within the limits of a particular program rather than in the context of every program under investigation." *General Issues Appendix*, 58 Fed.Reg. at 37,226. This Court recognizes there are competing interests at stake in this case which advocate the adoption of different approaches, but notes the methodology selected by Commerce is reasonable and, as defendant points out, "need not be the most reasonable approach nor the one the Court might itself favor." (Def.'s Br. at 98.) "[T]he grant of discretionary authority to an agency implies that the exercise of discretion be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." *Freeport Minerals Company (Freeport–McMoran, Inc.) v. United States*, 4 Fed. Cir. (T) 16, 18, 776 F.2d 1029, 1032 (1985). This Court finds Commerce's choice of a program–specific approach is a reasonable interpretation of the countervailing duty laws and is supported by substantial evidence on the record and is otherwise in accordance with law.[14]

### 2. Choice of the Benchmark Interest Rate

In its *Preliminary Determination* in this matter, Commerce used the German "Lending Rate" published by the International Monetary Fund ("IMF") in *International Financial Statistics* as the discount rate and as the benchmark interest rate for long–term fixed–rate loans.[15] The GOG objected to the

---

**14.** This Court notes the Department's position has remained consistent since the issuance of the *Proposed Regulations* in 1989. In the Department's proposed rules to conform the Department's existing countervailing duty regulations to the Uruguay Round Agreements Act, which implemented the results of the Uruguay Round multilateral trade negotiations, the Department indicated it would "retain[] (with some stylistic changes) the so–called 0.50 percent test." *Countervailing Duties; Proposed Rule*, 62 Fed.Reg. 8,818, 8,826 (Dep't Comm.1997). The Department further indicated it considered the test

> to be an important part of its efforts to simplify CVD proceedings and to reduce the burdens on all parties involved. By expensing small non–recurring grants to the year of receipt, the Department avoids the need to: (1) Collect, analyze, and verify the data needed to allocate such grants over time; and (2) keep track of the allocation calculations for minuscule subsidies from year to year.

*Id.* The Department did address one of the concerns advocated by Domestic Producers in this case—that foreign governments could evade countervailing duties by awarding small benefits under numerous programs—and indicated the Secretary would "normally" expense nonrecurring grants received under a program if the grants are less than 0.5 percent. The Department stated

> although we intend to continue to apply the 0.5 percent rule on a program basis, we have given ourselves the flexibility to take a different approach in situations where petitioners are able to point to clear evidence that the foreign government has deliberately structured its subsidy programs so as to reduce the exposure of its exporters to countervailing duties.

*Id.*

**15.** During oral argument in this case, counsel for LTV Steel explained that

> the idea behind the benchmark selection is to come up with ... a benchmark rate the Respondent could have obtained through private channels absent the subsidy. It's designed to be a reasonably accurate approximation of the cost of the money for the firms in question absent any subsidized lending.... [I]t has to

use of the IMF "Lending Rate" and argued instead the rate for 10–year mortgages on residential lots should have been used as the discount rate, or alternatively, a different IMF "Lending Rate" should have been used, such as one applicable to loans of between DM 1 million and DM 5 million, since most of the loans at issue exceeded DM 1 million.

In the *German Certain Steel Final Determination,* Commerce determined "the average preferred benchmark in this case is the rate for industrial bonds in Germany as published by the Deutsche Bundesbank." *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,322. Commerce explained its aim was to "obtain an objective measure of the company's long–term (rather than short–term) borrowing ability", and its "practice, as stated in section 355.44(b)(4) of the Proposed Regulations, sets out a hierarchy for selecting long–term interest rate benchmarks." *Id.* Commerce explained:

> [t]he most preferred options are (1) the interest rate the company under investigation pays for long–term loans, (2) the interest rate the company under investigation pays on debt obligations, *i.e.,* bonds, and (3) the variable rate the company under investigation pays for long–term loans. The next preferred option is the national average long–term interest rate in the country in question. The fact that the benchmark hierarchy does not specify either long–term loan rates or bond rates indicates that either is preferable to a long–term variable rate or a short–term rate.

*Id.* Commerce stated it endeavored in this case to "use[ ], whenever possible, each company's actual cost for long–term, fixed–rate debt" as the discount rate. *Id.* at 37,316. Commerce further explained, "[i]f a company did not report this cost, or when a company had no long–term borrowing in a year in which a grant was approved, we used the rates for industrial bonds provided for by the Deutsche Bundesbank" because that rate most accurately reflected the national aver-

age long–term fixed interest rate in Germany. *Id.*

Domestic Producers argue Commerce's use of the industrial bond rate published by the Deutsche Bundesbank when it lacked company–specific benchmark information was "wholly devoid of any record support" because it was not a reasonable reflection of the national average long–term interest rate, was a rate which "no party had advocated in its brief" and was *"lower* than any benchmark rate advocated by the respondent German steel producers." (Domestics' Br. at 10, 46) Domestic Producers further argue "[w]hile the Department is not required to adopt the positions advocated by the parties, and while the Department has considerable latitude in this regard, it may not, without record support for its choice, arbitrarily select an interest rate." (*Id.* at 48.) Domestics argue Commerce correctly used the German "Lending Rate" published by the IMF as the long–term benchmark interest rate and discount rate in the *Preliminary Determination,* and assert Commerce did not articulate in the *German Certain Steel Final Determination* why the rates on industrial bonds provided by the Deutsche Bundesbank were a more appropriate benchmark interest rate.

Domestics also maintain defendant and Thyssen "completely overlook the principle underlying the 'hierarchy' in the Proposed Regulations ... [which is] to approximate the interest rate that a company would pay for a comparable loan on market terms." (Domestics' Reply at 21.) Domestics assert Commerce "cannot rigidly follow the hierarchy of its Proposed Regulations when to do so would contravene its own prior practice and the fundamental purpose underlying the selection of benchmark rates." (*Id.* at 23.)

Domestics additionally assert Commerce's standard in selecting an appropriate discount rate has been whether loans at that rate were commercially available to the respondent. (Domestics' Reply at 22 (citing *Oil Country Tubular Goods from Argentina; Final Results of Countervailing Duty Admin-*

---

be approximately the rate that a reasonable banker would have been willing to lend during the period.

Oral Arg. Tr. at 119–120. The Court further added that if there is no market rate available, a constructive value is used.

*istrative Reviews,* 56 Fed.Reg. 38,116, 38,118 (Dep't Comm.1991) (Commerce rejected certain interest rates that did "not reflect the predominant commercial alternative source of credit" or were "not available to businesses" in the year in question in calculating benchmark interest rates); *Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish From Canada,* 51 Fed.Reg. 10,041, 10,063 (Dep't Comm.1986) (Commerce used short–term loans as benchmark because no commercially available long–term loans were found)).) Domestics argue the Department's claim that the commercial availability of loans or bonds is not the standard for determining whether Commerce may rely on a particular rate as a benchmark is "belied" by agency practice. Domestics argue, contrary to the government's assertions, the industrial bond rates selected by Commerce did not meet this standard of commercial availability. Domestics argue

> [t]he Department has not shown how the industrial bond rate provided by the Deutsche Bundesbank is comparable to the interest rate that the subject steel companies would have had to pay for capital investment funds or long–term loans on terms that were not 'inconsistent with commercial considerations.' Without such supporting evidence, the Department's determination cannot stand.

(Domestics' Br. at 48 (footnote omitted).) Domestics request this Court remand Commerce's selection of the industrial bond rate with instructions to Commerce to determine a benchmark interest rate for long–term fixed rate loans and a discount rate that is consistent with record evidence and that reflects the national average long–term interest rate.

In responding to the arguments raised by the Domestic Producers, defendant argues Commerce "reasonably rejected several alternative rates", such as the German "Lending Rate" published by the IMF, and "reasonably relied upon the industrial bond rates published by the Deutsche Bundesbank as the discount rate applicable to non–recurring

grants and the benchmark interest rate for long–term loans to calculate the benefit from the various subsidies in the underlying investigations." (Def.'s Br. at 106.)

First, defendant asserts Commerce adhered as closely as possible to its established practice in relying upon company–specific information whenever possible and in following its hierarchy of preferring to rely upon, absent a company–specific benchmark, the "national average long–term rate, either for loans or bonds," rather than short–term rates. *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,323; *see also Proposed Regulations,* 54 Fed.Reg. at 23,380 (to be codified at 19 C.F.R. § 355.44(b)(4)) (setting out hierarchy for selecting the benchmark interest rate). Defendant asserts Commerce considered all available alternatives and determined the Deutsche Bundesbank industrial long–term bond rate most reasonably reflected the national average long–term, fixed interest rate in Germany. (Def.'s Br. at 106–07.)

Second, defendant argues the IMF rate is a short–term rather than a long–term interest rate, and since Commerce "only relies upon short–term interest rates as a last resort", the long–term Bundesbank rate "was clearly preferable to the short–term IMF rate." (*Id.* at 107.) Defendant asserts "because Commerce relied upon a reasonable benchmark which was more in accordance with the agency's practice, there was no need for Commerce to resort to the IMF short–term rate." (*Id.*)

Finally, defendant argues Domestic Producers "assert[ ] incorrectly that Commerce's 'standard in selecting an appropriate discount rate has been whether the rates are commercially available,' and Commerce was therefore precluded from relying upon the Deutsche Bundesbank rate because the market for industrial bonds was not very active." (*Id.* at 107–08.) Defendant maintains the commercial availability of loans or bonds is not the standard for determining whether Commerce may rely upon a particular rate as a benchmark.[16] Rather, defendant contends,

---

16. Defendant adds that even assuming commercial availability were the standard, Commerce

found that the Deutsche Bundesbank industrial bonds were commercially available and that rate

"the proper standard is set out in Commerce's proposed regulations and requires only that Commerce select a reasonable benchmark in accordance with its hierarchy of preferences." (*Id.* at 108.)

Thyssen additionally argues the Department's selection of the yields on industrial bonds published by the Deutche Bundesbank as the benchmark interest rate was supported by record evidence and was consistent with the established methodology for selecting the benchmark interest rate. Thyssen maintains the Department "articulated a reasonable explanation in the Final Determination, which is wholly consistent with the 1989 Proposed Regulations, for its use of the Deutsche Bundesbank industrial bond rates as representative of national long–term interest rates in Germany." (Thyseen's Opp'n Br. at 4.) Thyssen also points out the Department explained the industrial bond rates published by the Deutsche Bundesbank were "very similar" and "consistent with" the bond rates offered by one of the respondent steel companies, Hoesch. Thyssen contends "[t]he mere fact that [Domestic Producers] are dissatisfied with the Department's choice of the long–term benchmark provides no basis for the [Domestic Producers'] request that this Court reverse the Department's otherwise reasonable and lawful decision." (*Id.* at 4–5.) Thyssen, therefore, argues this Court should affirm that aspect of the Department's *German Certain Steel Final Determination.*

■ This Court finds Commerce's selection of the rate for industrial bonds in Germany as published by the Deutsche Bundesbank as the benchmark interest rate in this case is a reasonable reflection of the national long–term interest rate and is supported by substantial evidence and is otherwise in accordance with law. Commerce correctly followed the hierarchy for selecting a benchmark interest rate that is established in § 355.44(b)(4) of the *Proposed Regulations* and chose not to utilize the IMF rate in the *German Certain Steel Final Determination* because it was a short–term rate. This Court notes Commerce's statement that "[t]he fact that the benchmark hierarchy does not specify either long–term loan rates

was reasonably comparable to other market

or bond rates indicates either is preferable to a long–term variable rate or a short–term rate", *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,322, and finds this statement to be a reasonable interpretation of the regulations. As Commerce noted, the Department's aim is to obtain an objective measure of the company's long–term borrowing ability and Commerce explained it chose a rate in the *Final Determination* which more closely approximated the actual lending rates available in Germany.

This Court also notes Commerce further explained that during verification, it "examined the yields on 'industrial bonds' published by the Deutsche Bundesbank. Similar to the mortgage–based rates suggested by the GOG, the yields on industrial bonds reflect the cost of secured long–term borrowing." *Id.* at 37,323. This Court must review Commerce's selection of the benchmark interest rate to determine whether or not it is supported by substantial evidence and is otherwise in accordance with law. This Court finds Commerce reasonably took into account the potential alternative interest rates and reasonably determined the Deutche Bundesbank industrial long–term bond rate was the most accurate reflection of the national average long–term fixed industrial rate in Germany. Therefore, this Court sustains Commerce's determination on this issue, finding it to be supported by substantial evidence on the record and otherwise in accordance with law.

3. *Treatment of a Portion of Ilsenburg's Joint Scheme Grant as a Short–Term Loan*

Commerce investigated and found countervailable grants provided under a program entitled "Joint Scheme for the Improvement of Regional Economic Structures" which had the primary goal of "assist[ing] companies in depressed areas" where the level of unemployment was higher than the national average. *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,317. Under the program, which was planned and financed by the GOG and state governments and imple-

rates. (*See* Def.'s Br. at 108.)

mented by the states, companies were eligible for grants equal to ten to twenty-three percent of their fixed investments, depending on the location and type of investment. Commerce determined the program was limited to enterprises or industries located in specific geographical regions and concluded "federal assistance provided under this program is specific and, therefore, countervailable." *Id.* Commerce also determined "state assistance under this program in all but the former GDR states ... is specific and countervailable." *Id.*

One of the German steel companies determined to have received nonrecurring grants under this program was Ilsenburg. Commerce found Ilsenburg, which was located in the former German Democratic Republic, "made one investment eligible for a grant prior to the currency unification", which "subsequently was revalued and written down by company auditors to reflect the effects of the currency unification." *Id.* at 37,318. According to Commerce, internal revenue auditors "advised [Ilsenburg] that it w[ould] be required to repay a part of the grant. The company is also liable for interest on the amount to be repaid." *Id.* Commerce determined that before calculating the grant benefit, it was reasonable to deduct the amount Ilsenburg would be required to repay, and to "treat[ ] the amount outstanding during the period of investigation as a short-term loan with an interest rate of six percent", which was the amount charged by the German governments for repayment of the grant. *Preliminary Determination,* 57 Fed. Reg. at 57,775. Commerce reasoned Ilsenburg would not be able to enjoy the full benefit of the grants and, therefore, it would not be appropriate to countervail the full value of the grants. Commerce responded to Ilsenburg's protest of the repayment claim stating:

> As a result of an audit by the government, Ilsenburg will be required to repay a portion of grants received under the joint scheme program. During verification, we noted that the repayment dates had not yet been determined because Ilsenburg was challenging the finding of the tax office. However, also during verification, we met with an auditor from the German tax office who indicated that a repayment nevertheless would be required, and that a repayment schedule should be set soon.

> Because Ilsenburg will be required to repay a portion of the grants received with interest, we have continued to treat this portion of the grant as a contingent liability, and have continued to adjust the amount of the grant for purposes of the benefit calculation. To do otherwise, as petitioners suggest, would lead to overcountervailing in the (likely) event of repayment.

*German Certain Steel Final Determination,* 58 Fed.Reg. at 37,324.

Domestic Producers assert Commerce's finding "a portion of the grant received by Ilsenburg should be treated as a short-term loan because it was 'repayable' is not supported by the record." (Domestics' Br. at 12.) Rather, Domestic Producers argue, Commerce's reasoning "does not bear scrutiny" because the program was never intended to be conditionally repayable. (*Id.* at 49.) Domestic Producers explain, as a general rule, countervailable subsidies are considered "received" as of the time the actual benefit is received.[17] Domestic Producers assert at the time the grants were received, "no such repayment had been effectuated or even scheduled." (*Id.* at 12.) Domestic Producers conclude, "the grant must be considered by the Department to be a countervailable grant in its entirety, unless repayment by Ilsenburg is actually effected", and "there is no concrete record evidence to support the agency's conclusion that ... repayment is likely to occur." (Domestics' Reply at 31, 32.) Domestic Producers argue "[t]here was nothing in the record to suggest that Ilsenburg had failed to qualify for the grant *ab initio.* The

---

**17.** The *Proposed Regulations* state

Ordinarily, the Secretary will deem a countervailable benefit to be received at the time that there is a cash flow effect on the firm receiving the benefit. The cash flow and economic effect of a benefit normally occurs when a firm experiences a difference in cash flows, either in the payments it receives or the outlays it makes, as a result of its receipt of the benefit. *Proposed Regulations,* 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.48(a)).

change in currency value was not an event foreseeable under the program and the request for repayment does not, by itself, turn the program into a conditionally repayable grant scheme." (Domestics' Br. at 50.)

Domestic Producers assert the Department treated the portion of the grant as if it had already been repaid even though it has not been repaid and "may *never* be repaid." (*Id.*) Domestic Producers maintain this grant is clearly distinguishable from grants received under the Aid for Closure of Steel Operation Program, where grants found to be repayable by German tax authorities and already repaid were also deducted from the total amount of the grants received before being amortized. The difference, Domestic Producers explain, is that Ilsenburg is challenging the repayment request, and repayment dates had not even been set at the time of verification. If Ilsenburg wins its challenge of the tax authorities' determination, Domestic Producers continue to explain, "the Department's decision to treat that portion of the grant as repayable with a six percent interest rate will have significantly underestimated the benefit of the subsidy received" because Ilsenburg will have benefitted from the entire amount of the grant and will have been countervailed only to the extent of the difference between the six percent interest rate and the applicable short–term benchmark interest rate. (*Id.* at 51.) Domestic Producers conclude this would be inconsistent with the countervailing duty laws' requirement that subsidies be countervailed to the extent of the benefits provided. As a result, Domestic Producers request this Court remand this issue with instructions that the Department countervail the entire amount of the grant.

Defendant responds by arguing Commerce "reasonably treated the repayable portion of the grants received by Ilsenburg under the Joint Scheme as a short–term, below market rate loan." (Def.'s Br. at 21.) Defendant asserts "[t]he record demonstrates that Commerce had a reasonable basis to conclude that Ilsenburg would be required to repay a portion of the grant because Ilsenburg's eligible investment had been revalued." (*Id.*) Defendant maintains "[e]ven though the re-

payment had not yet occurred, Commerce reasoned that the evidence supported the determination that it would occur and to have treated that portion as a grant would have led to 'overcountervailing in the (likely) event of repayment.'" (*Id.* at 110 (citation omitted).)

Defendant argues Commerce, after considering Domestic Producers' argument,

was faced with a choice. For Commerce to have adopted [Domestic Producers'] position, however, would have meant ignoring the evidence in the record demonstrating Ilsenburg would almost certainly be required to repay a portion of the grant. *By contrast, Commerce's determination took account of the entire record,* "including the body of evidence opposed to the [agency's] view."

(Def.'s Br. at 112–13 (citation omitted) (emphasis added).) Defendant concludes the routine nature of the auditing procedure reduced Ilsenburg's chance of prevailing upon its complaint and it was therefore reasonable for Commerce to conclude Ilsenburg would be required to repay the amount due.

 This Court notes defendant's explanation that "in considering the possibility that Ilsenburg might prevail in its effort to avoid repaying the money, Commerce analysts spoke at verification with the independent government tax auditor, who had reviewed Ilsenburg's own devaluation of its investment." (*Id.* at 113.) Defendant adds "[t]his individual indicated with a strong degree of certainty that although Ilsenburg had not yet begun repayment, it would be required to do so soon." (*Id.*) This Court also notes defendant's explanation that Commerce officials also spoke with German government officials who explained that throughout Germany "[i]t is standard procedure for grants received under this program to be audited." (*Id.* (citation omitted).) Defendant also stated "[i]n fact, audits of this type are common for many of the steel subsidies provided in Germany during the period of investigation." (*Id.* at 114.) This Court finds Commerce's determination that Ilsenburg would be required to repay the amount due, after Commerce took account of the entire record, is supported by substantial evidence on the rec-

ord. This Court therefore holds Commerce properly treated that portion of the grant received by Ilsenburg as a short–term loan.

### B. Thyssen's Motion for Judgment on the Agency Record

Thyssen Stahl AG, Thyssen Steel Detroit Company and Thyssen Incorporated (collectively "Thyssen"), plaintiffs in this matter whose case was consolidated under *LTV Steel Co., Inc., et al. v. United States,* Court No. 93–09–00568–CVD, urge this Court to reverse the Department's *German Certain Steel Final Determination* with respect to its decision to countervail benefits provided by Article 56(2)(b) of the European Coal and Steel Community Treaty ("ECSC Treaty") and the Aid for Closure of Steel Operations programs and remand this action to the Department with directions that the Department "(1) exclude those two programs from the calculation of any countervailing duties, and (2) determine that because any subsidies received by Thyssen were *de minimis* [,] Thyssen should be excluded from any affirmative countervailing duty determination as to Germany." (Thyssen's Mot. for J. on Agency R. at 1.) Thyssen indicates the basis of its claims is set forth in the brief filed with this Court by Fried. Krupp. Thyssen states "[t]o avoid burdening this Court with redundant Briefs, the two German plaintiffs, Fried Krupp and Thyssen, decided that Fried Krupp would file substantive briefs in this litigation, while Thyssen would file summary statements concurring in Fried Krupp's arguments." (Thyssen's Reply Br. at 2 n. 1.) This Court accordingly turns to Fried. Krupp's motion.

### C. Fried. Krupp's Motion for Judgment on the Agency Record

Fried. Krupp AG Hoesch Krupp and Krupp Hoesch Stahl AG (collectively "Fried. Krupp"), plaintiffs in this matter whose case was also consolidated under *LTV Steel Co., Inc., et al. v. United States,* Court No. 93–09–00568–CVD, challenge Commerce's *German Certain Steel Final Determination,* arguing it is unsupported by evidence on the record and is not otherwise in accordance with law with respect to two issues. First, Fried.

Krupp argues Commerce's decision to countervail one–half of the German government–funded portion of early retirement aid provided pursuant to Article 56(2)(b) of the ECSC Treaty is unsupported by substantial evidence and is not in accordance with law. Second, Fried. Krupp argues Commerce's decision to countervail funds provided under the German government's Aid for the Closure of Steel Operations program is also unsupported by substantial evidence and is not in accordance with law.

#### 1. Article 56(2)(b) of the ESCS Treaty

The European Coal and Steel Community was formed in 1951 by the ECSC Treaty and is one of three communities which joined together in 1965 to form the European Communities. The ECSC's objectives include improving the working conditions and standards of living for workers in the steel industry, and to that end, Article 56(2)(b) of the ECSC Treaty provides assistance for social adjustment to workers employed in the coal and steel industries who are affected by plant closings, downsizing or other labor force reductions or restructuring measures, particularly as workers withdraw from the labor market or are forced into early retirement or unemployment. The ECSC disburses assistance under this program on the condition that the country in which workers are displaced makes an equivalent contribution. Under the program, the company first pays the employees and is subsequently reimbursed by the federal government through the local labor office. *See German Certain Steel Final Determination,* 58 Fed.Reg. at 37,320; *GOG's Responses to Commerce's Aug. 10, 1992 Questionnaire* in Fried. Krupp's App. Tab 4 at 48. In evaluating this program, Commerce concluded "[s]ince the ECSC portion of payments under this program comes from the operational budget, which is funded by levies on the companies, we determine that this portion (*i.e.,* 50 percent of the amount received) is not countervailable." *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,320.

The German government contributed to the ECSC program, providing benefits to workers who retired or were laid off subject

to negotiations between labor and management. On June 27, 1988, pursuant to the Guideline for Granting Aid to the Iron and Steel Industry, the GOG increased its contribution to workers under Article 56(2)(b). *See id.* at 37,318. In evaluating the GOG's contribution to this program, Commerce considered whether, in the absence of ECSC assistance, the steel companies would have been obligated to furnish the same amount of early retirement benefits to their employees. In Germany, a company's obligations to employees who are forced into early retirement are outlined in the company's social plan, a negotiated agreement between the company and its employees which sets out the terms and conditions for ending employment and ways to mitigate the adverse effects on the employees of changes in the company's employee make-up.[18] In the *Preliminary Determination,* Commerce determined the entire amount of Article 56(2)(b) aid provided by the GOG was countervailable, because "the provision of funds is limited to a specific industry, and because the funds relieved companies of obligations they normally would have incurred." *Preliminary Determination,* 57 Fed.Reg. at 57,778. In the *German Certain Steel Final Determination,* Commerce concluded its *Preliminary Determination* on this issue had been in error, stating:

> the German steel companies and their workers were aware when they negotiated their social plans that the German government would pay a portion of the costs.

**18.** The GOG explained that on the occasion of a planned change in operations "the employee's council may demand that the employer conclude a social plan with the employees by which the economic disadvantages that the employees incur in the wake of the planned changes are counteracted or mitigated (e.g. severance pay)" or early retirement aid. (*GOG's Responses to Commerce's 8/10/92 Questionnaire* in Fried. Krupp's App 4 at 52.) The GOG further explained "[a] company change requiring the conclusion of a social plan is, above all, a reduction or closure of operations or of a major part of operations." (*Id.*) The GOG also explained

> The obligation to conclude social plans upon plant closures pursuant to Section 112 of the Industrial Constitution Act continues to be binding independent of ... [Article 56(2)(b)]. The extent and volume of these social plans is exclusively determined by the company and the representatives of the employees.

Therefore, we have determined that one half of the amount paid by the government constitutes a countervailable subsidy.

*German Certain Steel Final Determination,* 58 Fed.Reg. at 37,320–21. The Department's methodology for determining what portion of the Article 56(2)(b) contributions were to be countervailed is found in the *General Issues Appendix,* which states that to the extent a government assumes obligations that exist or otherwise would exist for steel companies, the government portion of the benefit is countervailable. *See General Issues Appendix,* 58 Fed.Reg. at 37,256–57.

Fried. Krupp argues "the purely hypothetical approach adopted by [Commerce] in analyzing Article 56(2)(b) aid in this investigation is inherently contrary both to [Commerce's] own established methodology for analyzing worker assistance programs and to the language and structure of the countervailing duty statute." (Fried. Krupp's Br. at 8.)

First, Fried. Krupp explains in past investigations of worker assistance programs, Commerce "consistently has recognized the need for [a] limitation on what can properly be deemed a 'subsidy' under § 1677(5)(A)(ii)(IV)" and has therefore held a government's provision of assistance to workers confers a countervailable benefit only to the extent that such assistance " 'relieves an enterprise or industry of a pre–existing statutory or contractual obligation.' " [19] (*Id.* at

(App. to Domestic Producers' Mem. in Opp'n to Fried. Krupp's Mot. for J. Upon Agency R. Ex. 7 at 50.)

**19.** Before Commerce may impose a countervailing duty, it must determine the German government is "providing, directly or indirectly, a *subsidy* with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States." 19 U.S.C. § 1671(a) (1988) (emphasis added). The term "subsidy" is defined by the statute to include a number of specified types of "domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries...." 19 U.S.C. § 1677(5)(A)(ii) (1988). Worker assistance programs, such as Article 56(2)(b) of the ESCS Treaty, are properly analyzed to determine whether they constitute a countervailable subsidy under subpart (IV) of 19 U.S.C. § 1677(5)(A)(ii), which provides that a "subsidy" for purposes of the

12–13 (citation omitted) (footnote omitted).) Fried. Krupp argues that evaluated under this methodology established by Commerce, "the German Government–funded portion of Article 56(2)(b) aid clearly is not countervailable" because "the Article 56(2)(b) program provides benefits solely to eligible steel workers, with the German steel companies acting at most as mere conduits for government aid", "which flowed from the Government to workers, without providing any subsidy to [the German producers]." (*Id.* at 14, 18.) Fried. Krupp analogizes this case to others in which Commerce determined there was no countervailable benefit. (*Id.* at 15 (citing *Final Affirmative Countervailing Duty Determinations; Certain Steel Products From Belgium,* 47 Fed.Reg. 39,304, 39,309 (Dep't Comm.1982) (Commerce did not countervail a labor assistance program because it determined the program "is really assistance to the workers passed through the companies" and payment of early retirement benefits does not confer a subsidy on a steel company unless it is thereby relieved of a cost it would otherwise be required to assume); *Final Affirmative Countervailing Duty Determination: Carbon Steel Wire Rod From France,* 47 Fed.Reg. 42,422, 42,431 (Dep't Comm. 1982) (Commerce determined it agreed companies at issue served as conduits for the distribution of certain funds and did not countervail them)).)

Fried. Krupp argues even where steel companies have undertaken to pre–pay Article 56(2)(b) aid as part of their labor agreements, "they have done so only upon the condition that the company would then be entitled to receive reimbursements for any pre–paid amounts from the German Government." (Fried. Krupp's Br. at 15–16 (footnote omitted).) Fried. Krupp concludes Commerce has not identified any evidence on the record indicating what obligation, "preexisiting or otherwise", German steel companies had to their employees that was relieved by the German Government's contribution to the Article 56(2)(b) program. Fried. Krupp argues, rather, "[t]he record ... is replete with overwhelming verified evidence that the other German steel companies made the provision of early retirement benefits contingent on the eligibility and receipt by early retired workers of assistance under Article 56(2)(b)." (Fried. Krupp's Reply at 9–10 (footnote omitted).) Fried. Krupp maintains the German steel companies had no obligation under German law to provide displaced workers with any social benefits, because "the terms and conditions of any agreements that result from negotiations between a company and its workers [*i.e.,* social plans] are not regulated by German law." (Fried. Krupp's Comm. on *Preliminary Determination, reprinted in* Fried. Krupp's App. Tab 16 at 7 (footnote omitted).) [20] Fried. Krupp concludes under Commerce's own methodology for analyzing worker assistance programs, "a government bestows no countervailable benefit where it imposes an obligation on a company and subsequently relieves the company of that obligation." (Fried. Krupp's Reply at 19.) [21]

---

CVD law may include "the assumption of any costs or expenses of manufacture, production, or distribution." 19 U.S.C. § 1677(5)(A)(ii)(IV) (1988).

**20.** The GOG explained that within the German legal system,

> there is no statutory provision generally obliging an employer to pay a severance pay upon dismissing an employee from the company.
> The payment of severance pay may be part of a collective bargaining agreement between management and labor. It may also be agreed on in the social plan worked out by the employees' council and management.

*GOG's Responses to Commerce's Aug. 10, 1992 Questionnaire* in Fried. Krupp's App. Tab 4 at 51–52. Additionally, the *General Issues Appendix* states "[i]n Germany, companies have no minimal legal obligation to severed employees. Rather, a company's obligations are determined

through negotiations with the labor union. The obligations, if they exist at all, exist by virtue of the social plans that are negotiated." *General Issues Appendix,* 58 Fed.Reg. at 37,257.

**21.** The GOG's Questionnaire responses assert

> [o]n the one hand, [Article 56(2)(b) aid] is also a benefit to which the individual employee in the company affected by closure has a claim. On the other hand, these support measures do not replace legal commitments by the company on behalf of their employees. There are no comparable legal commitments by the companies. The obligation to conclude social plans upon plant closures ... continues to be binding independent of a measure in line with [Article 56(2)(b)]. The extent and volume of these social plans is exclusively determined by the company and the representative of the employees.

Second, Fried. Krupp contends the hypothetical labor negotiation upon which Commerce based its methodology is not supported by any evidence on the record. Fried. Krupp contends Commerce never identified evidence in the record "of the actual power of labor unions in the German steel industry." (Fried. Krupp's Reply at 12.) Fried. Krupp argues:

rather than simply looking to see whether Article 56(2)(b) aid has in fact relieved German steel companies of some contractual obligation ... [Commerce] attempted to speculate about whether, in the absence of the German Government's contribution under Article 56(2)(b), the respondent steel companies might have elected to incur some new or different form of early retirement obligation to their workers.

(Fried. Krupp's Br. at 19.)

Fried. Krupp continues to contend that based on conjecture, Commerce made two factual assumptions about the effects of the Article 56(2)(b) program on labor negotiations in the German steel industry that were unsupported by any evidence on the record. Fried. Krupp maintains Commerce assumed absent the German government's contribution to Article 56(2)(b) that: (1) the issue of an increase in early retirement benefits would have become a point of meaningful negotiations and disagreement between the steel companies and their labor unions, and (2) the parties to such labor negotiations would have been of equal "negotiating strength" and would have agreed to provide their employees with 50% of the early retirement aid they had demanded. Fried. Krupp argues, rather, the "steel companies' prompt and complete responses to [Commerce's questionnaires] clearly indicated that the Article 56(2)(b) program relieved the companies of absolutely no legal or contractual obligations of any kind." (Id. at 22 (footnote omitted).)

Defendant argues "Commerce reasonably determined that one–half of the GOG–funded early retirement and other assistance provided pursuant to Article 56(2)(b) of the [ECSC] Treaty relieved Hoesch and other German steel companies of a contractual obligation they otherwise would have incurred, and thus constituted a countervailable subsidy," (Def.'s Br. at 71), fulfilling the requirement that Commerce must be able to "determine, on a case by case basis, exactly what the companies' obligations to severed employees are." General Issues Appendix, 58 Fed.Reg. at 37,256. Defendant argues Commerce reasonably based its determination upon its finding that when the steel companies and their workers negotiated social contracts to provide for their early retirement and severance benefits, they were aware the GOG, pursuant to Article 56(2)(b), would contribute a specified portion of that aid, and therefore, "some portion of the government assistance relieved the companies of a contractual obligation they otherwise would have incurred." (Def.'s Br. at 72.) [22]

Defendant continues to explain that due to the difficulty of determining the relative negotiating strengths of the companies and the employees, Commerce could not "measure the exact extent to which the GOG's contribution relieved the companies of providing more contractual benefits than they did", but found that absent the ECSC program, the contract negotiations would have resulted in different company obligations. (Id.) As a result of growing concern on the part of labor over job security and the steel industry's downsizing, defendant concludes "it stands to reason that job security and severance benefits would have been the single greatest concern on the part of labor." (Id. at 77.) [23] Defendant maintains, therefore, it

---

GOG's Responses to Commerce's 8/10/92 Questionnaire in Fried. Krupp's App. Tab 4 at 48–49.

**22.** In the General Issues Appendix, the Department distinguished between situations where government contributions relieve companies of obligations made under existing agreements which are negotiated with employees and situations when the contract is still being negotiated at the time the government's willingness to assume a portion of the program costs become

known, "because the government's contribution is likely to have an effect on the outcome of the negotiations." General Issues Appendix, 58 Fed. Reg. at 37,256. The Department's hypothetical on the labor negotiations follows from this distinction.

**23.** In its reply brief, Fried. Krupp argues Commerce

was reasonable for Commerce to conclude that increased early retirement and other benefits were issues of serious concern during the social plan negotiations, and it would have been in labor's interest to demand a larger severance package from the companies. On this basis, defendant explains, Commerce determined that absent the Article 56(2)(b) aid from the GOG, labor could have compelled the steel companies to make additional concessions. Hence, "Commerce reasonably concluded that the government contribution did, in fact, relieve [Fried. Krupp] of *some* identifiable contractual 'obligation it would otherwise have incurred'" and this relief "constituted a countervailable subsidy in some amount." (*Id.* at 78.)[24]

As a result of the difficulty in determining the outcome of the negotiations, defendant maintains it would be reasonable to assume the unions and government had equal bargaining power and that therefore, Commerce determined that for cash deposit purposes, "one–half of the government payment goes to relieving the company of an obligation that would otherwise exist." *General Issues Appendix*, 58 Fed.Reg. at 37,256. While defendant acknowledges Commerce's assumption was speculative, defendant argues Commerce determined "'any other outcome is both as speculative and prejudicial.'" In other words, it would have been unreasonable to conclude that either the workers or the companies would have completely prevailed in the negotiations." (Def.'s Br. at 81 (citation omitted).) Defendant argues Commerce used the best information available to measure the contractual obligation to be countervailed. Defendant notes Commerce invited the parties to comment on improved methodologies

for determining the amount to be assessed, but the parties failed to suggest any alternative methodologies.

Defendant also asserts the present determination is consistent with each of Commerce's previous worker assistance determinations, "and any differences are distinguishable based upon the facts of the two cases." (*Id.* at 85.) Defendant contrasts the decision in *Final Affirmative Countervailing Duty Determinations; Certain Steel Products From Belgium*, 47 Fed.Reg. 39,304, 39,324 (Dep't Comm.1982), where Commerce determined ECSC housing loans for workers provided the steel companies with hypothetical benefits and were "too remote to be considered subsidies" with this case, where substantial record evidence provides a firm basis for determining that steel companies received countervailable benefits. Defendant also contrasts the situation in *Final Affirmative Countervailing Duty Determinations: Carbon Steel Structural Shapes, Hot–Rolled Carbon Steel Plate, and Hot–Rolled Carbon Steel Bar from the United Kingdom; and Final Negative Countervailing Duty Determination: Cold–Formed Carbon Steel Bar from the United Kingdom*, 47 Fed. Reg. 39,384, 39,391 (Dep't Comm.1982), where Commerce found the government supplied a benefit to a third party which the company was not otherwise required to supply and thus was not a countervailable subsidy, with this case where the companies were required to supply the worker with negotiated benefits.

Defendant concludes by asserting "[Fried. Krupp] and the other [steel companies] were fully aware that the GOG's decision to relieve

---

was in no position to assess what level of early retirement benefits, if any, workers in the German steel industry might have demanded.... [N]o evidence on the record ... supported the assumption that workers in the German steel industry would have demanded a certain level of increased severance benefits, thereby making any reasoned measurement or estimate of any alleged subsidy impossible.

(Fried. Krupp's Reply at 7–8.) Fried. Krupp additionally argues "[t]he record is also devoid of any evidence that labor unions in the German steel industry would or could have successfully demanded increased early retirement benefits for workers." (*Id.* at 7 (footnote omitted).)

**24.** Defendant continues to comment on Commerce's discussions of the hypothetical negotiations that may have occurred between labor and the steel companies. In order to determine how large a portion of the benefits would be countervailable, Commerce had to determine the extent the government assumed obligations that existed or otherwise would have existed for the companies. (*See* Def.'s Br. at 78–79.) Commerce ultimately found the amount of the relative obligations of the companies and workers was entirely dependent on the strength and negotiating powers of the workers' unions.

a contractual obligation such as a social contract could result in a countervailable benefit just as relieving most legal or statutory obligations would." (Def.'s Br. at 89.) Defendant maintains Fried. Krupp's claim the assistance it provided to workers was expressly conditioned on the subsequent ability of the company to obtain reimbursement from the government is "blatantly incorrect" because an examination of Fried. Krupp's social contract reveals the company obligated itself to provide a complete compensation package, of which the GOG relieved only a specified amount.

Domestic Producers agree with the defendant and argue the Department's decision "is amply supported by the record and is clearly within the ambit of both the statute and the Department's previous determinations." (Domestic Producers' Mem. in Opp'n to Fried. Krupp's Mot. for J. on the Agency R. "(Domestics' Opp'n Br.") at 7.) Domestic Producers argue German law required the steel companies to develop social plans to deal with hardships caused by plant closings, and money given to the companies by the GOG benefitted the companies. Domestic Producers maintain

> [Fried. Krupp] is therefore mistaken when it asserts that the German steel companies were under no statutory obligation to provide assistance to workers made redundant by plant closings.
>
> . . . .
>
> It is clear that the [companies] had obligated [themselves] to provide severance benefits to [their] employees, regardless of the level of contributions from the government. Thus, any assistance by the GoG must therefore be viewed as an "assumption" of a contractual obligation.

(*Id.* at 14, 17.) Domestic Producers conclude the Department's hypothetical regarding the impact government aid would have had on company negotiations with employees "is a reasonable means of approximating the assumption of costs the steel companies would otherwise have incurred." (*Id.* at 21.)

■ The question before this Court, therefore, is whether the steel companies were serving as mere conduits for government aid to steel workers or whether they had contractual obligations to the steel workers which were relieved by government aid. After considering the evidence and arguments of all parties on this issue, this Court finds Commerce's decision to countervail one–half of the German government–funded portion of the early retirement aid is supported by substantial evidence on the record and is otherwise in accordance with law. The *Proposed Regulations* state that "[t]he provision by a government of financial assistance to workers confers a countervailable benefit to the extent that such assistance relieves a firm of an obligation which it normally would incur." *Proposed Regulations,* 54 Fed.Reg. at 23,382 (to be codified at 19 C.F.R. § 355.44(j)). *See also General Issues Appendix,* 58 Fed.Reg. at 37,256 (in order to countervail aid received pursuant to a worker assistance program, Commerce "must determine, on a case by case basis, exactly what the companies' obligations to the severed employees are" and the extent to which the government's worker assistance program relieved a portion of those obligations); *Final Negative Countervailing Duty Determinations; Certain Softwood Products From Canada,* 48 Fed.Reg. 24,159, 24,167–68 (Dep't Comm.1983).

In this case, Commerce determined the GOG's contributions relieved the steel companies of pre–existing obligations they incurred under German law through their social plans to negotiate with their employees to mitigate social hardships resulting from plant closings and employee lay–offs and provide the employees with assistance. Although the employer and employees have the freedom under German law to decide on the terms and conditions of benefits, the regional government of Saarland recognized "[i]t is mandatory to put up redundancy schemes [social plans] especially when the entire operations or essential parts thereof are to be discontinued" and "when laid off, employees may obtain social assistance from the company." (Gov. of Saarland's Deficiency Questionnaire at 6 (*reprinted in* App. to Domestics' Mem. in Opp'n to Fried. Krupp's Mot. for J. Upon Agency R. Ex. 2).) Commerce previously determined "the steel companies do have contractual and statutory obligations to pay severance to laid–off workers" that

are "legally binding." *Carbon Steel Wire Rod from France,* 47 Fed.Reg. at 42,430–31. As a result, this Court finds the steel companies benefitted from the GOG's contributions when they were relieved of obligations they had under the social plans with their employees and sustains Commerce's decision on this issue, finding it to be supported by substantial evidence on the record and otherwise in accordance with law.

This Court additionally notes Commerce found one company, Ilsenburg, had not yet negotiated a social plan with its workers during the period of investigation. Commerce concluded, as a result, "Ilsenburg had no obligation, legal or contractual, to provide payments to workers who were laid off", and "the portion of Article 56(2)(b) payments (funded by the GOG) made for Ilsenburg's workers do not constitute a subsidy because they did not relieve the company of an obligation it would otherwise have had." *German Certain Steel Final Determination,* 58 Fed.Reg. at 37,321. While this Court also notes Domestic Producers' argument that there was no obligation under German law for the companies to do more than negotiate with their workers, this Court finds for those companies which had concluded social plans with their workers, Commerce acted reasonably in determining the GOG's contributions relieved the steel companies of contractual obligations they would have incurred.

■ A separate issue is whether Commerce properly calculated the amount of the subsidy as one–half of the GOG's contributions. This Court finds Commerce's calculation of the subsidy as one–half the GOG's contributions is a reasonable estimate that is supported by substantial evidence on the record and is otherwise in accordance with law. Commerce had to determine what labor and management would have agreed to in the contract negotiations in the absence of the government's contribution to the early retirement program. Exactly what those obligations would have been is entirely dependent on the relative strength of the negotiating parties. While Commerce could not determine exactly what would have occurred had the government not been a party—albeit an invisible one—to the negotiations, it was reasonable for Commerce to determine that officials would have renegotiated the terms of the plan, absent the government's contribution. This Court notes defendant's statement Commerce invited the parties to comment on improved methodologies for determining the amount to be countervailed, but the parties failed to do so. Further, this Court notes no party has requested an administrative review of the formula determined by Commerce. As a result of the above, this Court sustains the determination of Commerce, finding it to be supported by substantial evidence on the record and otherwise in accordance with law.

**2. Aid for the Closure of Steel Operations**

Commerce's *German Certain Steel Final Determination* also countervailed a separate worker assistance program created by the German government's Rules on Providing Funds to Iron and Steel Companies to Give Social Assistance for Structural Adjustment, which were adopted by the GOG on May 3, 1988 (the "May 3, 1988 Rules"). This program was designed to reduce the economic and social costs of plant closings in the steel industry, and the federal and state governments provided grants to the iron and steel industries for expenses incurred with respect to displaced employees. Assistance under this program was available for workers laid off between January 1, 1987 and December 31, 1990, a period in which about 35,000 employees in the steel industry were laid off. *See Verification of the GOG's Questionnaire Response* in App. of Answers of Def. and Def.–Intervs.' to Ct.'s Questions Reg. Worker Assist. posed at Oral Arg. Ex. 4 at 6.

In its reply brief, Fried. Krupp quotes Commerce's description of the agreement [25] the GOG entered into with the steel companies, noting that

---

**25.** The agreement was known as the Frankfurt Agreement, entered into by the GOG with the steel companies on June 10, 1987. According to the GOG, by means of the May 3, 1988 Rules, "mass dismissals in the steel industry were averted and the process of reconstructuring was bolstered." *GOG's Responses to Commerce's Aug. 10, 1992 Questionnaire* in Fried. Krupp's App. Tab 4 at 50.

"[i]n an effort to avoid country–wide unemployment of young people and therefore potential social unrest, the [GOG] *convinced* the companies to lay–off those closer to retirement age thereby keeping the workforce young. In return, the [GOG] (through both federal and state funds) would ... provide grants of up to 50 percent of the companies' net outlays for redundant employees."

(Fried. Krupp's Reply at 17 (quoting Pre–pension Mem. (Pub. Doc. 138 F. 48 Fr. 24) at 6).) The agreement encouraged the steel companies to lay–off older workers, thereby causing the companies to incur greater severance costs than if they had laid–off younger workers. The total amount of federal and state aid provided to steel companies was not permitted to exceed fifty percent of a company's net expenditures incurred as a result of plant closings. *See German Certain Steel Final Determination,* 58 Fed.Reg. at 37,318.

In both the *German Certain Steel Preliminary* and *Final Determinations,* Commerce found the entire amount of GOG aid provided pursuant to this worker assistance program was countervailable. *See German Certain Steel Final Determination,* 58 Fed.Reg. at 37,318; *Preliminary Determination,* 57 Fed. Reg. at 57,778. Commerce stated

[a]lthough it was claimed that closure assistance was provided so that companies would lay off older rather than younger workers, the amount of assistance provided by the GOG does not appear to take into account the difference in the costs of laying off the differently aged workers. Instead, it is calculated using the total costs of reducing the work force. Therefore, in accordance with the Department's general determination regarding early retirement, we determine that the assistance did not merely benefit the older employees who were retired early. Instead, it relieved the company of a portion of the early retirement costs it otherwise would have incurred. The Department has determined that this benefit constitutes a countervailable subsidy....

*German Certain Steel Final Determination,* 58 Fed.Reg. at 37,318.

In the *General Issues Appendix,* Commerce set out its methodology regarding various types of worker assistance programs, and stated in order for a worker assistance program to be countervailable, "the Department must determine, on a case by case basis, exactly what the companies' obligations to severed employees are." *General Issues Appendix,* 58 Fed.Reg. at 37,256. Commerce explained when the government, by law, imposes obligations upon all companies generally, "a program which relieves a company of these legal obligations is clearly countervailable." *Id.* Commerce also determined

[i]n many instances, companies' obligations to their terminated employees are not outlined under the law, but under contracts negotiated with the workers. When these contracts are already in place and the government subsequently steps in to assume a portion of the amount the company is obligated to provide, we have determined that government assistance is countervailable. Thus, we are treating certain contractual obligations as legal obligations.

*Id.* Finally, Commerce explained when the government's willingness to provide assistance is known at the time the contract is being negotiated, absent evidence to the contrary, Commerce will presume the negotiating parties would have split the difference. Commerce would then consider that one–half of the government contribution relieved the company of an obligation that otherwise would have existed. *See id.* Commerce explained its reasoning:

The Department could determine that absent the ECSC program, the contract negotiations would have resulted in different company obligations. In Germany, exactly what those obligations would have been, however, is entirely dependent on the strength and negotiating powers of the steelworkers' unions; there is no indication of a minimum level of benefits a terminated employee expects to receive. Therefore, the Department could either assume that the unions were weak and would not have been able to demand the full amount that they receive under the ECSC program, or that they were strong, and would have received the full amount. Since ei-

ther assumption would be completely arbitrary, the Department's *most reasonable solution* would be to assume that both the unions and the companies have equal bargaining power, and that therefore, absent the ECSC program, the companies would be required to pay half of the amount of aid granted by the ECSC and the government under the ECSC program. This would mean that half the benefits from the program would be countervailable. However, since the ECSC portion of the contributions cannot be countervailed (because they are financed by company contributions), the amount which would be countervailed would be equal to one–half of the government contribution.

(*See Commerce Memo re Treatment of Pre-pension Benefits and Worker Assistance Programs* in App. of Answers of Def. and Def.–Intervs.' to Ct.'s Questions Reg. Worker Assist. Posed at Oral Arg. Ex. 9 at 15–16 (emphasis added).)

Fried. Krupp additionally challenges Commerce's decision to countervail funds provided under the German government's Aid for the Closure of Steel Operations program, arguing it is unsupported by substantial evidence and contrary to Commerce's own established methodology. Fried. Krupp argues uncontradicted evidence in the record "demonstrates that funds provided under this program were used to provide assistance to workers who had lost their jobs *and* that the assistance in question would not have been provided to those workers in the absence of the [program]." (Fried. Krupp's Br. at 9.)

Fried. Krupp argues "[t]he record is clear that the steel companies agreed to provide as full a package of severance and early retirement benefits to their workers as they ultimately did only 'because of the government's commitment to provide aid to retired workers.'" (*Id.* at 26 (citation omitted).) As a result, Fried. Krupp maintains the steel companies were not relieved of any obligations that they had incurred or normally would have incurred in the absence of the program created by the May 3, 1988 Rules. Fried. Krupp argues, "[r]ather, under that program, the companies were acting merely as conduits of government aid designed to assist displaced workers in the steel industry." (*Id.* at 27.)

In response, defendant argues Fried. Krupp did not raise any objection to Commerce's determination on this issue at any time during the administrative proceeding. Defendant argues as a result, Fried. Krupp "failed to exhaust its administrative remedies" and "should be precluded from raising this issue before the Court now." (Def.'s Br. at 62 (citing 19 C.F.R. § 355.38(a) (1992) (Commerce "will consider in making the final determination ... only written arguments in case or rebuttal briefs filed within the time limits in [the regulations]")).) Defendant concludes Fried. Krupp "should be barred from arguing, for the first time before this Court, that Germany's closure assistance is not countervailable." (Def.'s Br. at 63 (footnote omitted).) Defendant additionally maintains none of the exceptions to the exhaustion requirement are applicable in this case.[26]

---

**26.** Although in its Motion for Judgment on the Agency Record, Thyssen indicates the basis of its claims is set forth in the brief filed with this Court by Fried. Krupp, in its reply brief, Thyssen also states

> [i]n response to defendant's suggestion ... Fried Krupp failed to exhaust its administrative remedies and, therefore, is precluded from challenging the methodology used by [Commerce] to countervail the Aid for Closure program, we note that Thyssen challenged the DOC's Determination regarding this program in its April 1, 1993 Case Brief at 9. Thus, even if this Court agrees with defendant that Fried Krupp cannot challenge [Commerce's] determination at this time, this Court nevertheless should summarily dismiss defendant's "exhaustion" claim and decide this issue on in

[sic] merits, since Thyssen's challenge clearly is not barred by the exhaustion doctrine.

(Thyssen's Reply Br. at 1–2.) In its reply brief, Fried. Krupp addresses defendant's exhaustion argument and maintains

> it would have been totally impossible for [Fried. Krupp] to have challenged [Commerce's] methodology during the underlying investigation, because [Commerce] did not articulate that methodology until the Final Determination. In light of the relevant statutory standards and case precedent regarding the exhaustion of administrative remedies doctrine, this Court should reject Defendant's exhaustion argument and consider Plaintiffs' current challenge to [Commerce's] treatment of the Aid for Closure program in the Final Determination.

(Fried. Krupp's Reply at 13.)

Defendant argues even if the Court reaches the merits of this issue, Commerce's determination should be affirmed because it is based upon substantial evidence and is otherwise in accordance with law. Defendant maintains Fried. Krupp incorrectly argues it and the other steel companies agreed to provide laid–off workers with a package of benefits only with the expectation the government would pay one–half of those benefits. Defendant explains, rather "substantial evidence in the record clearly establishes that when the GOG passed the [May 3] Rules in 1988, it relieved [Fried. Krupp] of the obligation under [Fried. Krupp]'s social contract, renegotiated in 1986, to provide early retirement and severance benefits to its employees." (Def.'s Br. at 71.) Defendant concludes Fried. Krupp's obligation to its workers predated the GOG's adoption of the May 3, 1988 Rules by almost two years.

After carefully considering the arguments of both parties as well as the evidence on the record, this Court finds Commerce's determination to countervail the benefits provided under the May 3, 1988 Rules is supported by substantial evidence on the record and is otherwise in accordance with law. First, this Court considers it proper to evaluate Fried. Krupp's challenge to Commerce's determination to countervail this worker assistance program because Fried. Krupp raised this challenge to Commerce's decision and methodology in a timely manner, after Commerce articulated its policy on pre–pension programs in the *General Issues Appendix* and applied that methodology to the worker assistance program at issue in this case—the May 3, 1988 Rules. This Court noted in *Al Tech Specialty Steel Corp., v. United States,* 11 CIT 372, 377, 661 F.Supp. 1206, 1210 (1987) that "in determining whether questions are precluded from consideration on appeal, the Court will assess the practical ability of a party to have its arguments considered by the administrative body." In *Philipp Bros., Inc. v. United States,* 10 CIT 76, 86, 630 F.Supp. 1317, 1324 (1986), this Court held that because Commerce did not address the issue challenged before the Court until its final decision, plaintiff had no opportunity to raise the issue at the administrative level and the exhaustion doctrine did not preclude judicial review. The Court similarly finds in this case, Fried. Krupp did not have the opportunity to challenge Commerce's methodology until Commerce articulated that methodology and applied it to the program at issue. Moreover, this Court notes Thyssen also challenged Commerce's decision to countervail the Aid for Closure program after the *Preliminary Determination,* albeit on more limited and general grounds. As a result, this Court will address the merits of Commerce's determination to countervail the Aid for Closure program.

The Court notes Commerce determined the GOG's adoption of the May 3, 1988 Rules relieved the steel companies of obligations they would have incurred pursuant to social contracts negotiated with their employees, and this Court cannot find a reason to disturb that determination. *See General Issues Appendix,* 58 Fed.Reg. at 37,255 (in order to be countervailable, a worker assistance program must relieve a company of a pre–existing statutory or contractual obligation the company has previously incurred or otherwise would have incurred) (citing *Proposed Regulations,* 54 Fed.Reg. at 23,382 (to be codified at § 355.44(j))); *Final Affirmative Countervailing Duty Determination: Carbon Steel Wire Rod From Belgium,* 47 Fed. Reg. 42,403, 42,408, 42,424 (Dep't Comm. 1982). Commerce explained

[i]f the Government contributions which were provided had been directly correlated to the costs of laying off older workers, then the company would be receiving no benefit from this program. However the GOG assistance was calculated on the total costs of reducing the workforce, not just the difference in costs of terminating the older employees versus the younger employees, thereby indicating that the assistance did not merely benefit the older employees who retired early.

(*Commerce Mem. re Treatment of Prepension Benefits and Worker Assistance Programs* in App. of Answers of Def. and Def.–Intervs.' to Ct.'s Questions Reg. Worker Assist. Posed at Oral Arg. Ex. 9 at 17.) As a result, this Court sustains Commerce's deter-

mination on this issue, finding it is supported by substantial evidence and otherwise in accordance with law.

## CONCLUSION

After considering the parties' Motions for Judgment on the Agency Record and the parties' arguments therein, and for the reasons discussed above, this Court holds Commerce's *German Certain Steel Final Determination* is supported by substantial evidence on the record and is otherwise in accordance with law. Accordingly, this Court denies Domestic Producers's Motion for Judgment on the Agency Record, finding (1) Commerce's application of the 0.5 percent test; (2) Commerce's decision to use the Deutche Bundesbank industrial long–term bond rate for the benchmark and discount rates; and (3) Commerce's determination that Ilsenburg would be required to repay the amount of the grant and to treat a portion of the grant as a short–term loan are supported by substantial evidence on the record and are otherwise in accordance with law. This Court additionally denies Thyssen's and Fried. Krupp's Motions for Judgment on the Agency Record, finding Commerce's decision to countervail one–half of the German government–funded portion of early retirement aid provided pursuant to Article 56(2)(b) of the ECSC Treaty is supported by record evidence. Additionally this Court finds Commerce's decision to countervail benefits provided under the Aid for Closure of Steel Operations program is supported by substantial evidence and is otherwise in accordance with law. This Court therefore grants defendant's application to sustain Commerce's *German Certain Steel Final Determination.*

## JUDGMENT ORDER

This case having been duly submitted for decision, and this Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

**ORDERED** that Domestic Producers' Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that Thyssen's Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that Fried. Krupp's Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED** that Commerce's *German Certain Steel Final Determination* is sustained.